289 N.W.2d 791 (1980)
In the Interest of R. H., D. D. H., M. L. H., N. N. H., all minors under the age of 14 years.
Roland WEISENBURGER, Director of Social Service Board of McIntosh County, North Dakota, Petitioner and Appellee,
v.
R. H., a minor; D. D. H., a minor, M. L. H., a minor; N. N. H., a minor, Respondents,
R. H. and G. H., natural parents of said minors, Respondents and Appellants.
Civ. No. 9406-A.
Supreme Court of North Dakota.
March 13, 1980.
*792 Bruce E. Kretschmar, State's Atty., Ashley, for petitioner and appellee.
Richard E. Herr, Wishek, for respondents and appellants.
SAND, Justice.
The parents of R.H., D.D.H., M.L.H., and N.N.H., all minors under the age of fourteen years, appealed from an order of the McIntosh County juvenile court which extended for another two years a 21 March 1978 order of that court which adjudged the children deprived and removed them from the care, custody, and control of their parents. We affirm.
On 26 March 1977, the McIntosh County Social Services Board initiated proceedings under the Uniform Juvenile Court Act, Ch. 27-20, North Dakota Century Code, to have the four minor children in this case, R.H., D.D.H., M.L.H., and N.N.H., determined deprived and to have them removed from the care, custody, and control of their parents. Following several hearings on the matter, the juvenile court issued an order on 20 July 1977 which found as a fact that each of the four children was deprived and terminated all parental rights. The parents appealed that order to the North Dakota Supreme Court, and, in Interest of R.H., 262 N.W.2d 719 (N.D.1978), this Court affirmed the juvenile court's finding of deprivation but reversed and remanded for further proceedings the question of termination of parental rights because it was not shown that the causes and conditions of deprivation were likely to continue.
Pursuant to the directive contained in Interest of R.H., supra, the juvenile court, on 21 March 1978, ordered the four children removed from the care, custody, and control of their parents and, until 11 July 1979, placed them under the care, custody, and control of the director of the social services in and for McIntosh County. The order further provided that N.N.H. was to remain in the adolescent center at the Jamestown State Hospital, where she had been placed in June 1977 for treatment of child psychosis and mild mental retardation, until that unit determined that she could be released. The court was also to receive, at least quarterly, periodic reports of N.N.H.'s condition while she was at the adolescent center. In addition, the other three children were to be phased back into the parental home on a fulltime basis, subject to the condition that the parents make arrangements with the director of social services in McIntosh County to have a qualified homemaking assistant in the home during the day. The parents were also required by the juvenile court to undergo parental counseling at the south central mental health center in Jamestown, North Dakota.
The order of the juvenile court was carried out with specificity by everyone concerned, and the record indicated that *793 some degree of progress was made both with regard to living conditions in the parental home and with regard to the mental health of N.N.H. in the adolescent center of the state hospital. Nevertheless, on 9 July 1979, the director of the McIntosh County social services board petitioned the juvenile court for a two-year extension of its 21 March 1978 order because the purposes of that order were not yet achieved in that the four children were still without the proper parental control and subsistence necessary for their physical, mental, or emotional health.
The juvenile court heard testimony on the petition for extension on 10 July 1979, and on 13 August 1979. The witnesses testifying before the court included the director of the McIntosh County social services board, two homemaking assistants who assisted the parents in caring for the parental home and the children, N.N.H.'s clinical psychologist at the adolescent center at the State Hospital, a staff physician at the adolescent center at the State Hospital, and the father of the four children in this case. At the close of the evidence, which included substantial testimony relative to N.N.H.'s status at the State Hospital, the juvenile court found that the parents of the four children in this case were in need of continued supervision and monitoring as to the care, control, subsistence, and education of the children and that the lack of care, control, subsistence, and education was not due primarily to the lack of financial means of the parents. The juvenile court then ordered that the children remain in the care, custody, and control of the director of the social services in and for McIntosh County for another two years. It was further ordered that the social services board of McIntosh County explore other available facilities for the care and treatment of N.N.H.
The parents appealed the extension order to this court.
The scope of review in North Dakota on appeals from juvenile court decisions under Ch. 27-20, NDCC, is governed by § 27-20-56(1), NDCC, which states in relevant part as follows:
". . . The appeal shall be heard by the supreme court upon the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court. . . ."
This standard of review is a broad review, and is very similar to our former practice of "trial de novo." Our review is, therefore, not limited to a determination of whether or not the juvenile court's findings are clearly erroneous. In Interest of M.L., 239 N.W.2d 289 (N.D.1976); In re A.N., 201 N.W.2d 118 (N.D.1972).
The two questions raised by the parents on appeal and to which this scope of review applies, are whether or not the two-year extension of the juvenile court order was proper or necessary to accomplish the purposes of the order, and whether or not N.N.H. was properly reassigned to the State Hospital for the duration of the extended period.
An order of disposition by a juvenile court under the Uniform Juvenile Court Act may be extended by that court for a further period of time pursuant to § 27-20-36(3), NDCC, which provides as follows:
"3. Any other order of disposition continues in force for not more than two years. The court may sooner terminate its order or extend its duration for further periods. An order of extension may be made if:
a. A hearing is held prior to the expiration of the order upon motion of a party or on the court's own motion;
b. Reasonable notice of the hearing and opportunity to be heard are given to the parties affected;
c. The court finds that the extension is necessary to accomplish the purposes of the order extended; and
d. The extension does not exceed two years from the expiration of the prior order." [Emphasis ours.]
However, before the juvenile court in this case extended its order of disposition, it was *794 necessary for that court to make a determination that the four children involved were still "deprived" as defined by § 27-20-02(5), NDCC, because the entire jurisdiction of the juvenile court is dependent upon a finding that the children are in fact "deprived." Section 27-20-03, NDCC; In Interest of M.L., supra.
Section 27-20-02(5), NDCC, defines a "deprived child" as a child "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian. . . ."
The original order of disposition issued by the juvenile court on 21 Mar 1978 found the four children deprived and placed them in the care, custody, and control of the director of social services in and for McIntosh County. The extension order issued by the juvenile court on 16 Aug 1979, however, did not contain a specific finding that any or all of the four children involved were still "deprived." The court found instead that the children were all minors, that the parents were in need of continued supervision as to the care, control, subsistence, and education of the children, and that such need was not primarily due to lack of financial means.
Despite the fact that the juvenile court did not make a specific finding of fact that the four children in this case were still deprived, we think that fact can be inferred from the court's statements at the close of the hearing and from some of the statements in the findings.
Prior to its order of extension, the juvenile court heard extensive testimony relative to the physical health, intellectual capabilities, and social development of the children and the conditions in which they were living in the parental home. This testimony indicated that there had been substantial improvement in both the living conditions in the parental home and the social development of the children since the time of the original juvenile court order. Nevertheless, all the witnesses testifying for the McIntosh County social services board stated that the parents of the four children involved, while continuing to make definite gains toward parental autonomy, were still very much in need of outside assistance and supervision in maintaining the improved conditions in their home and in caring for their children.
The record, as we review it on a de novo basis, giving appreciable weight to the findings of the juvenile court, is supportive of a finding of continued deprivation, and we are convinced the children are still deprived. Although we think that this finding of fact should have been, and in the future should be, specifically included in the extension order, the juvenile court did sufficiently establish its jurisdiction in this case. Were it not for our de novo review we probably would have had to remand the case for more specific findings of fact.
While we stress that a specific finding should be made on deprivation, we cannot overemphasize the need for evidence to support such a finding, which is the case here. We also suggest that if adequate findings are made it might eliminate an appeal.
The parents of the children in this case argued on appeal that the extension of the juvenile court's 21 Mar 1978 order was not necessary to accomplish the purposes of the court's original order. The application for extension of the order stated that the four children in this case were still without proper parental control, subsistence and education as required by law, and that it was necessary for the children's physical, mental or emotional health and morals that the order be extended. The application then requested that the juvenile court extend its previous order to accomplish the purposes of that order as provided for in § 27-20-36(3)(c), NDCC.
After hearings on the application, the juvenile court issued the extension, stating that it was in the children's best interest that the order be extended for an additional two years. Here is where the order should have been more specific and the statute should have been used as a guide, *795 assuming the statements are supported by the evidence. The mere tracking of statutory language will not be sufficient if not supported by the evidence.
While it is clear to us from our de novo review and the juvenile court's statement at the close of the hearings and in the findings of fact that the court was genuinely and primarily concerned with the welfare of the children and with whether or not continued governmental supervision was required, we are certain that there would be greater assurances of fairness and justice in cases of this nature if the statutory language were followed by the juvenile courts with more specificity.
In this case, the record illustrated that the juvenile court examined all the testimony and exhibits pertinent to the disposition of the request for extension. At the close of the hearings, the juvenile court made the following statement:
"As the Court sees it, the condition in the [parental] home materially bettering itself without any outside intervention, as all the testimony in the particular case shows, that is not the case. There has been a rather on going effort by the social services department to provide a great deal of care. The testimony of Dr. Zimmerman to the effect, that with the home help that is now being given to the [parents], that this situation is tolerable. In reading his report: `The examiner would feel that the home situation will continue to need very close monitoring if the children are to remain with their natural parents and that extensive homemaker services and special learning opportunities such as day care or pre-school or nursery school will be needed in order to give the children a reasonable opportunity to develop their intellectual skills' and et cetera. It seems to me that the evidence in this hearing is replete, it cries out for a continuation of the order if these children are to be given a passable chance at a normal existence. I think certainly we in society owe them that."
After reading all the testimony from the hearings in this matter and carefully reviewing the entire record, we agree with the juvenile court's assessment of the evidence and think that the two-year extension of the 21 Mar 1978 order was warranted.
The parents of the four children in this case also argued that the juvenile court's reassignment of N.N.H. to the adolescent center at the State Hospital was improper because it was contrary to the purposes of the Uniform Juvenile Court Act.
The primary purposes of the Uniform Juvenile Court Act as it applies to the instant case, was to provide for the care, protection, and wholesome moral, mental and physical development of the four minor children involved. Section 27-20-01, NDCC. To facilitate the successful achievement of these purposes, the juvenile courts are granted concurrent jurisdiction with county courts of increased jurisdiction of proceedings to treat or commit a mentally retarded or mentally ill child who is subject to the jurisdiction of the juvenile court. Section 27-20-04, NDCC. N.N.H. was subject to the jurisdiction of the juvenile court because she and her three siblings were "deprived children," as thoroughly discussed above.
The uncontested evidence in the record revealed that N.N.H. has been in the adolescent center of the State Hospital since June 1977 for care and treatment of child psychosis with mild mental retardation. More specifically, N.N.H. is afflicted with childhood schizophrenia and is ambivalent, autistic, and has flat affect. The medical director at the adolescent center at the State Hospital stated that N.N.H. was not ready to go permanently back to the parental home because even short visitations in the home environment over the past few years have had regressive effects on her mental condition. Further, the area supervisor of child protective services testified that she knew of no other place in North Dakota, other than the adolescent center in the State Hospital, which would be of benefit or help to N.N.H.
Upon this evidence, the juvenile court, pursuant to § 27-20-04, NDCC, extended *796 its prior order which placed N.N.H. in the adolescent center and ordered the social services board of McIntosh County to further explore the facilities available in this state or surrounding states for the care and treatment of N.N.H., who showed little improvement in the present facility.
Our review of the record convinced us that the juvenile court's decision with regard to N.N.H. was sound and in her best interest. We also note that the original order of the juvenile court provided that the adolescent center was to furnish the court with reports, at least quarterly, of N.N.H.'s condition and progress. The court was also to be notified of N.N.H.'s release one month prior to her eligibility date so that the court could then make an appropriate order in her regard. Thus, the treatment at the State Hospital was to continue only as long as the physicians there thought it was necessary for N.N.H.'s benefit, and not necessarily the entire two-year extension period.
The parents in this case finally urged that if N.N.H. were to be kept in the State Hospital, the proper procedure would be to have her committed under the theory that she was a "person requiring treatment" pursuant to Ch. 25-03.1, NDCC. This Court stated, in Interest of R.H., supra, that proceeding under Ch. 25-03.1, NDCC, as a prerequisite to a proceeding to terminate parental rights would interfere with the duty of the juvenile authority to take such action as may be required in light of the facts and circumstances in the individual case. We continue to adhere to that position in this case. We do recognize, however, that commitment under Ch. 25-03.1, NDCC, imposes periodic review requirements by the proper authorities and that discharge can be obtained by the individual if he is no longer in need of treatment. The order of the juvenile court in this matter required at least quarterly review of N.N.H.'s condition and progress, and it also provided that N.N.H. could be released if her progress so permitted. We believe that this procedure, when invoked after an in-depth hearing such as was had in this case, satisfies the constitutional due process standards which were recently delineated by the United States Supreme Court in Parham v. J. R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979).
Notwithstanding the insightful and thought-provoking arguments which were presented by counsel for the parents in this case, we affirm the decision of the juvenile court.
ERICKSTAD, C. J., and PAULSON, PEDERSON and VANDE WALLE, JJ., concur.